1
2
3
4

**SCHLEIER LAW OFFICES, P.C.**
3101 N. Central Avenue
Suite1090
Phoenix, Arizona 85012
Telephone: (602) 277-0157
Facsimile: (602) 230-9250

5
6
7

TOD F. SCHLEIER, ESQ. #004612
Tod@SchleierLaw.com
BRADLEY H. SCHLEIER, ESQ. #011696
Brad@SchleierLaw.com

8

Attorneys for Plaintiff Felicia Prostrollo

9

IN THE UNITED STATES DISTRICT COURT

10

DISTRICT OF ARIZONA

| | |
|---|---|
| 11  Felicia Prostrollo, a married woman, ) | No. |
| 12          Plaintiff, ) | **COMPLAINT** |
| 13  v. ) | |
| 14  Scottsdale Healthcare Hospitals dba ) | **(Demand for Jury Trial)** |
| 15  HonorHealth, an Arizona non-profit ) entity; Scottsdale Healthcare Auxiliary, ) | |
| 16  an Arizona, non-profit entity; and Robert ) Brown, a married man, ) | |
| 17          Defendants. ) | |
| 18 ) | |
| 19 ) | |

20
21

    Plaintiff Felicia Prostrollo, for her Complaint against Defendants Scottsdale Healthcare Hospitals dba HonorHealth, Scottsdale Healthcare Auxiliary, and Robert Brown alleges as follows:

22

**JURISDICTION AND VENUE**

23
24
25
26

    1.    The jurisdiction of this Court is invoked pursuant the Court's federal question jurisdiction as set forth in 28 U.S.C. §1331 and the Family Medical Leave Act ("FMLA"), 29 U.S.C. §2611, *et. seq.*

1    2.    This Court also has supplemental jurisdiction to hear the corresponding state

2    law claims that form part of the same case or controversy as set forth in 28 U.S.C. §1367.

3    3.    The complained upon actions were committed within the State of Arizona, on

4    Defendant's premises located in Maricopa County, State of Arizona.  Accordingly, venue in

5    this Court is proper pursuant to 28 U.S.C. § 1391(b).

6    **PARTIES**

7    4.    Plaintiff Felicia Prostrollo ("Plaintiff" or "Prostrollo") resides in Maricopa

8    County, Arizona, and is a married woman.

9    5.    Plaintiff Prostrollo was an "employee" of Defendant Scottsdale Healthcare

10   Hospitals dba HonorHealth ("HonorHealth") within the meaning of 29 U.S.C. § 2611, *et.*

11   *seq.,* and at all times material to this action.

12   6.    Defendant Scottsdale Healthcare Hospitals is the owner of HonorHealth which

13   was founded in 2015 as a separate, non-profit Arizona entity also providing healthcare and

14   volunteer services, and an employer doing business in the State of Arizona.  Defendant

15   HonorHealth was the "employer" of Plaintiff Felicia Prostrollo within the meaning of 29

16   U.S.C. § 2611, *et. seq.,* and at all times material to this action.

17   7.    Defendant Scottsdale Healthcare Auxiliary is a separate, non-profit Arizona

18   entity doing business in the State of Arizona, providing volunteer health services working

19   with HonorHealth's volunteer services department.

20   8.    Defendant Robert Brown is a married man and resides in Maricopa County,

21   State of Arizona.

22   9.    At all relevant times, Defendant Robert Brown was a volunteer with Defendant

23   Scottsdale Healthcare Auxiliary and was elected President Elect on its Auxiliary Board as

24   of April 16, 2015.

25   10.   The acts of Defendant Brown described herein were done for his own personal

26   benefit and/or on behalf of his marital community.  Defendant Brown's conduct was also

- 2 -

1  done on behalf of Defendant Scottsdale Healthcare Auxiliary and in the course and scope of

2  his role as President of said entity.

3  **FACTUAL BACKGROUND**

4      11.    John C. Lincoln Health Network and Scottsdale Healthcare merged and

5  announced the new name of HonorHealth in 2015.

6      12.    Plaintiff Felicia Prostrollo started working with Scottsdale Healthcare in

7  December 2006 at the three Scottsdale Campuses (Osborn, Shea and Thompson Peak), and

8  continued to work with HonorHealth in the same role as the Director of Volunteer

9  Services following the merger.

10      13.    Plaintiff Prostrollo worked as the Director of Volunteer Services for nearly

11  ten (10) years, from December 2006 up to her termination on July 6, 2016.

12      14.    At the time of her termination, Plaintiff Prostrollo reported directly to Bruce

13  Pearson, Defendant HonorHealth's Chief Operating Officer.

14      15.    In her role as Director of the Volunteer Services, Plaintiff Prostrollo oversaw

15  her department staff comprised of Volunteer Services Specialists, Supervisors for the

16  Osborn, Shea and Thompson Peak HonorHealth divisions, and data entry coordinators.

17      16.    The HonorHealth's Auxiliary Gift Shop Manager who oversaw the supervisor

18  and coordinators for the Osborn, Shea and Thompson Peak Auxiliary Gift Shops, also

19  reported to Plaintiff Prostrollo.

20      17.    Throughout Plaintiff Prostrollo's employment with Scottsdale Healthcare

21  and HonorHealth, Plaintiff was a top performing employee, collaborated with the hospital

22  administrators, always received good reviews, merit bonuses, and never received any type

23  of disciplinary action. Most recently in 2016, Plaintiff Prostrollo received two bonuses on

24  March 15 and April 22, for a cumulative bonus amount of $14,643.

25

26

1    18.    Plaintiff Prostrollo met with Bruce Pearson, COO twice, after a year of
2    reporting structure change. Mr. Pearson telephonically conducted his performance review of
3    Plaintiff Prostrollo.

4    19.    On about May 17, 2016, Plaintiff Prostrollo' husband had surgery scheduled
5    at a non-HonorHealth hospital. Plaintiff Prostrollo made her supervisor, Bruce Pearson,
6    aware of the time she was taking off and kept Mr. Pearson updated on the need for
7    additional time off.

8    20.    Following the surgery, Plaintiff's husband had some initial complications
9    but was subsequently released.  Upon returning home, Plaintiff's husband went into septic
10   shock and was admitted to HonorHealth's Shea campus on June 7, 2016.  Plaintiff's
11   husband was in ICU and Plaintiff stayed with him around-the-clock.

12   21.    During Plaintiff's husband's medical issues, Defendant's annual Past
13   Presidents of the Auxiliary luncheon was scheduled to occur, which had been scheduled a
14   year in advance.

15   22.    Plaintiff Prostrollo's role with the Auxiliary luncheon included overview of the
16   event and presentation of volunteer contributions for the previous year.  The purpose of the
17   luncheon was to honor the past Presidents' of the Scottsdale Healthcare Auxiliary for their
18   achievements, and was an informal social inclusionary gesture.  The annual luncheon was
19   attended by the Chief Executive Officer, Supervisor of the Volunteer Director, Volunteer
20   Director, staff and spouses.

21   23.    Due to her husband's medical condition, Plaintiff Prostrollo was unable to
22   attend the luncheon and sent Tom Sadvary, HonorHealth's Chief Executive Officer, a
23   message that her husband was in Defendant's Shea hospital and that she would not be
24   attending the luncheon.

25   24.    Plaintiff's leave to care for her husband was FMLA qualified leave.

26

- 4 -

25.    Within hours of the luncheon, Plaintiff Prostrollo began receiving text messages, emails and calls from former past Presidents asking about Plaintiff's husband.

26.    Plaintiff Prostrollo was informed by staff and luncheon attendees that Tom Sadvary had announced to the luncheon group that Plaintiff's husband was an inpatient at the Shea hospital.

27.    During this time, Plaintiff's husband was experiencing more complications and his stay in the hospital was again extended. Plaintiff Prostrollo continued to keep Mr. Pearson notified of her situation and Mr. Pearson approved Plaintiff's continued leave.

28.    Though on leave, Plaintiff Prostrollo worked from the hospital room through remote access and handled some meetings *via* cell phone.

29.    On June 23, 2016, Plaintiff Prostrollo received an email from Hope Underwood, Defendant HonorHealth's Auxiliary President, who copied board members and in error, a non-board member volunteer, stating that she was aware of Plaintiff's husband's condition and requested a meeting.

30.    Plaintiff Prostrollo responded to the email stating she believed the email was in violation of the law and that she was reporting the matter to the Risk Manager and HIPAA officer.

31.    Plaintiff Prostrollo sent a message to Lynn Barrett, AVP Risk Management regarding the shared email and Plaintiff Prostrollo's concerns about privacy violations either by volunteers or staff.

32.    Lynn Barrett emailed Plaintiff and asked to see what Plaintiff had shared with her staff, and copied Jonathan Wallach, the legal compliance officer.   Plaintiff had provided her staff with very limited information relating to her husband and that she would not be in the office but would be working from the hospital.  Lynn Barrett told Plaintiff that Jonathan Wallach would address her concerns.

33.     Thereafter, Plaintiff Prostrollo left at least two voice messages for Mr. Wallach and multiple messages with Shannon Wainman in Human Resources, about Plaintiff Prostrollo's concerns about privacy violations.

34.     Plaintiff Prostrollo did not hear from either Mr. Wallach or Ms. Wainman, until Plaintiff retrieved a voice message from Jonathan Wallach on July 5, 2016, the day Plaintiff returned to the office from her FMLA qualified leave.

35.     Plaintiff Prostrollo returned Mr. Wallach's call on July 5, 2016, but did not hear from him. Plaintiff Prostrollo also emailed Ms. Wainman in HR the same day.

36.     Plaintiff Prostrollo received an email from her Supervisor, Bruce Pearson requesting a meeting with Plaintiff on July 6, 2016.  Plaintiff Prostrollo showed up at Mr. Pearson's office for the meeting, and Ms. Wainman from HR was also present.

37.     During the July 6, 2016 meeting, Mr. Pearson told Plaintiff he decided to take Volunteer Services in another direction and terminated Plaintiff Prostrollo's employment.

38.     Pearson told Plaintiff Prostrollo that she needed to leave the premises, that her belongings would be packed for her, and that they would communicate with the Board and her staff about Plaintiff's termination. Bruce Pearson presented Plaintiff with a termination agreement.

39.     At no time prior to Plaintiff's termination or during the July 6, 2016 meeting had Plaintiff Prostrollo been made aware of any performance issues, or any other issues, nor had she been placed on any corrective action plan.

40.      Bruce Pearson subsequently sent a meeting request to Plaintiff's staff and sent a general letter to all volunteers about the change in the volunteer leadership and that they would be recruiting for Plaintiff Prostrollo's replacement.

41.     The only change to the direction of Volunteer Services was the removal and replacement of Plaintiff Prostrollo.

42.    Within weeks of Plaintiff's June 23, 2016 reporting of Defendant's privacy violation by releasing her husband's medical information, and one day after returning from being on FMLA qualified leave to care for her husband, Defendant terminated Plaintiff Prostrollo's employment on July 6, 2016.

43.    Plaintiff Prostrollo learned that prior to her termination, Defendant Robert Brown had written a letter complaining about Plaintiff Prostrollo to her Supervisor, Bruce Pearson, and emailed it to Mr. Pearson twice, on May 4, 2016, and May 10, 2016, and then also emailed his letter on May 16, 2016 to Shannon Wainman of HR and Gary Pastore of HR.

44.    Defendant Brown wrote in his letter directed to Plaintiff's Supervisor, Bruce Pearson, and to Shannon Wainman, HR and Gary Pastore, HR, that Brown was aware that "a letter like this is potentially damaging for someone's career".

45.    At no time prior to her termination was Plaintiff made aware of Brown's letter or was interviewed with regard to any of the contents in the letter.

46.    At no time during Plaintiff Prostrollo termination meeting on July 6, 2016 with Bruce Pearson and Shannon Wainman, HR, was Plaintiff made aware of any performance issues, of Defendant Brown's letter, or complaints or concerns by another staff and/or volunteer. In fact, Pearson told Plaintiff the reason she was being terminated was because Pearson was taking the Volunteer Services in another direction.

47.    Prior to Plaintiff's termination, Defendant Brown had contacted Plaintiff Prostrollo in January/February 2016 about hiring his friend Anne Lugo for a clerical position at HonorHealth, stating his friend was in poor financial situation.

48.    Plaintiff Prostrollo interviewed Anne Lugo ("Lugo") and, based on Lugo's representations and Brown's request, hired Lugo for an entry position sometime in February/March 2016.

49.     Throughout March/April 2016, Lugo trained with Plaintiff Prostrollo and Prostrollo's staff and it quickly became clear that Lugo had misrepresented her skill level and was not meeting the job requirements.  Lugo received counseling about her work performance and continued to represent that she could do the job.

50.     By the end of April 2016, Lugo's performance had not improved and Plaintiff Prostrollo spoke with Shannon Wainman at HR about taking some corrective action and possible options for Lugo to stay on.

51.     By April 26, 2016, Plaintiff Prostrollo and Shannon Wainman, HR met with Anne Lugo about her work performance.  During this meeting, Prostrollo agreed with Wainman and offered Lugo the opportunity to transfer to another department or stay on as an unassigned employee without pay for thirty (30) days to obtain another position; or she could continue as a paid employee, and would have to meet the job requirements within seven (7) days.  Lugo continued to represent that she could do the job, and Lugo chose the seven (7) day option.

52.     Lugo failed to meet the job requirements within the timeframe Lugo   chose, and Plaintiff Prostrollo terminated Lugo's employment on May 3, 2016.

53.     Plaintiff Prostrollo learned that Lugo had been communicating with Robert Brown throughout the March/April 2016 timeframe, about working with Plaintiff Prostrollo and the work issues Lugo was experiencing.

54.     Upon information and belief in that same timeframe March/April 2016, Defendant Brown, on his own volition solicited staff, current and former terminated employees, and volunteers and solicited negative information about Plaintiff Prostrollo allegedly mistreating employees and volunteers and formulated his letter complaining about Plaintiff Prostrollo.

55.     Within one day after Lugo's termination, a disgruntled Defendant Robert Brown emailed his letter on May 4, 2016, to Bruce Pearson, COO, and Prostrollo's Supervisor, complaining about Plaintiff Prostrollo.

56.     Defendant Brown again emailed his letter to Bruce Pearson, COO on May 10, 2016, and then emailed his letter to Shannon Wainman, HR and Gary Pastore, HR on May 16, 2016.

57.     In his letter, Defendant Brown at no time claims he was subjected to the alleged mistreatment by Plaintiff Prostrollo but states, among other things, he "witnessed and been privy to behaviors that are unethical, not a good reflection on the HH brand," and that he is "committed to the people" he has contacted.

58.     Defendant Brown also criticized HonorHealth in his letter stating, "this has been going on for many years and its one of those things that seemingly everyone knows about yet no one does anything about"…"these things have been brought up to various people in power at HH multiple times, and while they have acknowledged this as being an "issue", no real action has ever been taken," and that "some people were actually told 'just keep your head down.'"

59.     Upon information and belief, Defendant Brown met with Bruce Pearson on May 23, 2016 and also provided his PowerPoint titled "Bruce Pearson Meeting May 23, 2016," outlining among other things, that Brown solicited negative statements against Plaintiff Prostrollo.

60.     Plaintiff Prostrollo learned that Defendant Brown solicited many employees and volunteers, but deliberately only selected and utilized the negative statements from those who fit Defendant Brown's criteria against Plaintiff Prostrollo.

61.     Plaintiff Prostrollo learned that Defendant Brown did not mention any of the current and/or former employees and volunteers he also solicited, who provided positive

1    information about Plaintiff Prostrollo, including but not limited to Mary Masters and
2    Susan Jablonoski.

3          62.    In his letter, Defendant Brown made defamatory statements about Plaintiff
4    Prostrollo's alleged mistreatment including that he "witnessed and been privy to behaviors
5    that are unethical…"

6          63.    In his letter, Defendant Brown also outrageously and slanderously
7    sensationalized his claims against Plaintiff Prostrollo by comparing Prostrollo's alleged
8    mistreatment towards staff and volunteers to that of "the whole Bill Cosby scandal…".

9          64.    Defendant Brown alleges that Plaintiff Prostrollo's mistreatment affected
10   campus supervisors, volunteer department staff, gift shop employees, auxiliary board
11   members, volunteers, human resources, hospital executives and medical professionals.

12         65.    Defendant Brown also threatened to quit the Board rather than work with
13   Plaintiff Prostrollo, if no action was taken against Prostrollo.

14         66.    Incredibly, Defendant Brown also compared himself to feeling like
15   renowned political investigative Watergate reporters, Bob Woodward and Carl Bernstein.

16         67.    At no time prior to Plaintiff's termination was Plaintiff Prostrollo made
17   aware of any staff and/or volunteer complaints and/or concerns.

18         68.    Defendant Brown intentionally interfered with Plaintiff's employment
19   reputation and employment relationship with HonorHealth, defamed Plaintiff, and his
20   letter influenced, caused, and/or contributed towards Plaintiff's termination.

21                                   **COUNT ONE**

22              **(VIOLATION OF A.R.S. §23-1501 - RETALIATION)**

23                         **(Defendant HonorHealth)**

24         69.    Plaintiff realleges all the allegations fully set forth above.

25         70.    Defendant HonorHealth terminated Plaintiff's employment within weeks of
26   Plaintiff's good faith report of what she believed was Defendant HonorHealth's unlawful

1  conduct or believed to be unlawful in the release of confidential information in violation

2  A.R.S. §12-2292 and A.A.C. R9-10-212**.**

3       71.    A.R.S. 23-1501 prohibits the termination of employment by an employer in

4  retaliation of an employee's good faith report of suspected violations of Arizona law.

5       72.    Plaintiff's termination was retaliatory and is in violation of A.R.S. §23-

6  1501(c) due to her good faith report of the violation of Arizona law.

7       73.    As a direct result of Defendant HonorHealth's retaliation, Plaintiff has

8  sustained and continues to sustain damages in the form of lost compensation and loss of

9  future wages and the value of benefits.

10       74.    As a direct result of Defendant HonorHealth's unlawful conduct, Plaintiff

11  has sustained emotional distress, including loss of reputation, loss of profession, and

12  emotional pain, suffering, and humiliation.

13       75.    Defendant HonorHealth's conduct in retaliating against Plaintiff was

14  malicious, done with reckless indifference, and/or performed with an evil mind so as to

15  entitle Plaintiff to punitive and/or exemplary damages.

16  **COUNT TWO**

17  **(VIOLATION OF THE FMLA – RETALIATION)**

18  **(Defendant HonorHealth)**

19       76.    Plaintiff realleges all the allegations fully set forth above.

20       77.    Defendant HonorHealth is an employer obligated to conform with the

21  FMLA.

22       78.    Plaintiff is a covered employee under the FMLA.

23       79.    Plaintiff was forced to take FMLA qualifying leave due to her husband's

24  serious illness, and pursuant to her rights under the FMLA.

25       80.    One day Plaintiff returns to work from FMLA qualified leave, Defendant

26  HonorHealth terminated Plaintiff on July 6, 2016.

81.     The FMLA guarantees that an employee taking leave will not result in the loss of job security or in other adverse employment actions.

82.     The FMLA provides job security and leave entitlements for employees who need to take absences from work for personal medical reasons to care for their newborn babies, or to care for family members for serious illnesses.

83.     Defendant HonorHealth violated the FMLA by failing to retain Plaintiff after her taking FMLA qualified leave to care for her husband and terminating her employment one day after Plaintiff returned to work from her leave.

84.     Defendant HonorHealth has also retaliated against Plaintiff based on her assertion of rights where she was going to continue to need to utilize time under the FMLA for the care of her husband by terminating her employment.

85.     As a direct and proximate result of Defendant HonorHealth's retaliatory actions, Plaintiff has suffered and continues to suffer economic damage in the form of lost wages and the value of job benefits.

86.     Defendant HonorHealth has acted willfully in its violation of the FMLA in retaliating against Plaintiff thereby entitling her to a doubling of the damages set forth above as liquidated damages as authorized by 29 U.S.C. § 2617(a)(1).

## COUNT THREE

## (INTERFERENCE WITH PLAINTIFF'S EMPLOYMENT
## RELATIONSHIP WITH HONORHEALTH)

### (Defendant Robert Brown And Defendant Scottsdale Healthcare Auxiliary)

87.     Plaintiff rellages the allegations fully set forth above.

88.     Defendant Brown was a volunteer Board Member and President of Defendant Scottsdale Healthcare Auxiliary.

89.     Defendant Brown knew of Plaintiff's existing employment relationship with Defendant HonorHealth.

- 12 -

90.     Defendant Brown sent his letter against Plaintiff and wrote directly to Plaintiff's supervisor and Human Resources stating that Brown knew that sending his letter against Plaintiff Prostrollo was potentially damaging to Plaintiff's career. The letter was designed to have Plaintiff terminated.

91.     Defendant Brown intended to interfere with Plaintiff Prostrollo's employment reputation and employment relationship with Defendant HonorHealth when he sent his letter against Plaintiff.

92.     Defendant Brown's conduct was done in bad faith and designed to interfere with Plaintiff's employment relationship with Defendant HonorHealth.

93.     Defendant Brown's interference was done on his own personal behalf, on behalf of his marital community, and in the course and scope of his role as President of the Scottsdale Healthcare Auxiliary.

94.      Defendant Brown's interference influenced, caused, and/or contributed to Plaintiff's termination.

95.     As a direct and proximate result of Defendant Brown's and Defendant Scottsdale Healthcare Auxiliary's conduct, Plaintiff has sustained and continues to sustain damages in the form of lost wages and the value of benefits.

96.     As a direct result of Defendant Brown's and Defendant Scottsdale Healthcare Auxiliary's unlawful conduct, Plaintiff has sustained emotional distress, including loss of reputation, loss of profession, and emotional pain, suffering, and humiliation.

97.     Defendant Brown's and Scottsdale Healthcare Auxiliary's conduct in interfering with Plaintiff and HonorHealth's employment relationship was malicious, done with reckless indifference, and/or performed with an evil mind so as to entitle Plaintiff to punitive and/or exemplary damages.

**COUNT FOUR**

**(DEFAMATION)**

**(Defendant Brown and Defendant Scottsdale Healthcare Auxiliary)**

98.     Plaintiff rellages the allegations fully set forth above.

99.     On or about May 4, 2016, May 10, 2016 and May 16, 2016, Defendant Robert Brown made and published false statements about Plaintiff Prostrollo comparing Prostrollo's alleged mistreatment towards staff and volunteers to that of "the whole Bill Cosby scandal…", and that he "witnessed and been privy to behaviors that are unethical," about Plaintiff.

100.    The statements about Plaintiff were false and untrue and impute to Plaintiff's alleged mistreatment towards staff and volunteers to being like that of "the whole Bill Cosby scandal…", which she is not, or her conduct being unethical, which it was not.

101.    These published statements are false and bring Plaintiff into disrepute, contempt and ridicule and impeach her honesty, integrity, virtue and reputation by stating that she engaged in such misconduct. Defendant Brown's statements are also defamatory because they would deter third persons from dealing or associating with Plaintiff.

102.    These published statements are false and bring Plaintiff into disrepute, contempt and ridicule and impeach her honesty, integrity, virtue and reputation by stating that she engaged in such misconduct in her trade, profession, office or occupation. Defendant Brown's statements are also defamatory because they would deter third persons from dealing or associating with Plaintiff.

103.    These statements are of and concerning Plaintiff Prostrollo as she has been identified in Defendant Brown's letter.

104.    These statements were published when Defendant Brown communicated them to Defendant HonorHealth, Plaintiff's employer.

- 14 -

105.   The disparaging statements published are not privileged and if they are privileged, Defendant Brown abused the privilege because his allegations were made without belief or grounds for belief in the truth of the statements.

106.   Defendant Brown acted with actual malice in that he knew his statements regarding Plaintiff were false and/or acted in reckless disregard of the truth.

107.   Defendant Brown made said statements on his own personal behalf, on behalf of his marital community, and in the course and scope of his role as President of the Scottsdale Healthcare Auxiliary.

108.   As a direct and proximate result, Plaintiff has sustained damage to her reputation as a result of Defendant Brown's statements which influenced, caused, and/or contributed towards Plaintiff's termination.

109.   Defendant Brown's statements were made with actual malice and oppressiveness and with reckless disregard of the truth and Plaintiff's rights, and was not the result of a mistake of fact or law, an honest error of judgment which would be punished and to deter others from like conduct in the future, thereby warranting an award of punitive and exemplary damages.

**WHEREFORE**, Plaintiff requests that the Court enter Judgment against Defendants HonorHealth, Scottsdale Healthcare Auxiliary, and Brown, individually and jointly, as follows:

1.   Special damages to be proven at trial;

2.   General damages and compensatory damages to be proven at trial, including an award of all back pay, front pay, and the value of lost benefits;

3.   Punitive or exemplary damages;

4.   An award of liquidated damages;

5.   Attorney's fees;

6.   Costs of suit;

7.      Prejudgment and post-judgment interest; and

8.      For such other relief as this Court deems just and proper.

**JURY REQUEST**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

DATED this 9th day of February, 2017.

SCHLEIER LAW OFFICES, P.C.

/s/ Bradley H. Schleier
Bradley H. Schleier
3101 North Central Ave., Suite 1090
Phoenix, Arizona 85012
Attorneys for Plaintiff Felicia Prostrollo

- 16 -